## THE GADSBY.

### THE FRANK A. PALMER.

(District Court, E. D. New York. November 25, 1902.)

1. COLLISION—STEAMER AND SCHOONER MEETING IN FOG—FAILURE TO KEEP PROPER LOOKOUT.

A steamer and a schooner came into collision 120 miles southeast of Sandy Hook Lightship, in a dense fog, on meeting and nearly parallel courses. The testimony from each vessel showed that she was going at moderate speed, was properly manned, and that fog signals were regularly sounded; but neither vessel heard the signals from the other until immediately before they came in sight of each other, when 400 feet apart, and when it was too late to avoid the collision. *Held,* upon such evidence, that (1) each vessel duly sounded fog signals; (2) each vessel was running at proper speed; (3) neither vessel kept a proper lookout; that such fault on the part of the schooner did not contribute to the collision, because it would have been her duty to keep her course under the circumstances, if she had heard the signals, but that the steamer must be held solely liable as the burdened vessel, and because she might by the exercise of due care have avoided the collision.

In Admiralty. Suit for collision.

Wing, Putnam & Burlingham, for Clark and the Frank A. Palmer.
Convers & Kirlin, for Robinson and the Gadsby.

THOMAS, District Judge. The four-masted schooner Palmer, unladen, sailing west, and the steamer Gadsby, laden, sailing east by south, in a fog that had existed for an hour and a half, collided at a point about 120 miles or 130 miles southeast from Sandy Hook Lightship. Each vessel had a full crew, whose members, with a single exception, have testified.

The evidence of the Gadsby is to the following effect: The steamer was, and had been for about an hour and a half, running at half speed, not to exceed four knots per hour, duly sounding fog signals, with an attentive lookout at her stem, the chief officer and a wheelsman on the upper bridge, the captain on the upper bridge until 6:20 a. m., then on the lower bridge, and several seamen busied on the deck, no one of whom heard fog signals from the Palmer, when the chief officer heard a screeching sound like that of a steam whistle, whereupon he signaled to stop, the time being 6:33 a. m.; blew a long blast on the whistle. The captain ran up to the upper bridge, arriving there 10 seconds later, learned of a whistle on the port bow, and signaled to reverse the engines, which was done. The Palmer, going, as variously estimated, at from 8 to 12 knots an hour, in a fresh breeze, listed to port, carrying all her 13 sails, came in sight 400 feet away, which was the limit of vision, bearing one and a half or two points on the Gadsby's port bow; whereupon the Gadsby's engines were put half speed ahead, the wheel ordered hard aport, one course whistle sounded; but it appearing that the schooner did not go to starboard, and that a collision was inevitable, the Gadsby's wheel was put hard astarboard, to throw her stern out and ease the contact. The steamer's port side abaft the smokestack struck the bow of the schooner, whereby the engineer's house of the steamer was carried

away by the port anchor of the schooner, which was imbedded in it, the life-boats crushed, and other damage done to the steamer's sides and decks. The Gadsby slid past the schooner, and thereafter went about, and, searching for the Palmer, found her within a half an hour after the collision, and towed her to within a few miles of Sandy Hook.

The evidence of the Palmer is to the following effect: The schooner was on the starboard tack, with a light breeze from the northeast, on a course from west to west one-half north, with only her four lower sails and four head sails set, running about four miles per hour, with an attentive watch forward, who was and had been from a little before 6 o'clock industriously sounding fog signals from the fog horn. Another seaman was at the wheel, the mate was on the quarter deck forward of the wheelsman, and another seaman was in the waist. When the steamer's whistle was heard ahead, but was not located, the mate ran forward, and ordered three short blasts of the fog horn to be sounded, which was done. The Gadsby came in sight less than a point on the port bow, and about 400 feet away, running at the rate of nine knots per hour. A course signal of one whistle was heard. The mate ordered the wheel hard down, which was attempted, but before the course of the schooner could be changed perceptibly the Gadsby was upon her, listing her over to port, and carrying away the jibboom guys, breaking the port cathead, parting the port anchor chain, breaking the bow planking below the lower chain plates, and driving her forward house to starboard.

Thus it appears that each vessel, in regard to lookout, attentiveness, speed, and sounding fog signals, by her own evidence fulfilled her duty, and did not fulfill it in any of these particulars by the evidence of the opposite vessel. From this evidence it is concluded: (1) Each vessel duly sounded fog signals; (2) each vessel was running at proper speed; (3) neither vessel kept a proper lookout.

Although each vessel should have heard the fog signals of the other, at an earlier time, yet Dolan, the lookout on the steamer, did not hear, nor did any person upon her hear, any sound from the schooner, except her chief officer, who heard, as he claims, something similar to a steam whistle.

Thus, a steamer, sailing under favorable conditions of weather, had in the existing watch, the lookout, chief officer, the boatswain, the wheelsman, the steward, a spare man on deck, the master himself, and yet there was no discovery of the schooner's fog signals until the vessels were so near that collision was inevitable. On the other hand, Johnson, the lookout on the schooner, had the dual duty of an outlook and to turn the crank of the fog horn. He was blowing his horn and looking down, and the first that he saw of the steamer was when her amidships were abreast of the schooner's port bow. Shortly before he had heard a whistle a little off the port bow. He seemed to be in doubt as to the nature of the whistle, although he regarded it as the usual whistle blown in foggy and clear weather. At that time the mate came forward. Johnson told him that there was a steamer right ahead. The mate said that he had heard the whistle. Johnson, by the mate's order, blew twice after that, but the

steamer was "on top of us" when he saw her. This indicates an inattention on the part of the lookout that may or may not have arisen from his preoccupation in sounding the horn or his proximity to it. The mate in charge of the vessel, and other persons on the deck, heard no more than did the lookout. So that the case shows that although each vessel blew proper fog signals none of them were duly heard by the opposite vessel.

From the evidence it is necessary to find either that the fog signals were not blown, or that the persons on deck of the several vessels were inattentive. With the ample evidence that the signals were blown, it is difficult to arrive at a conclusion that such was not the case, and, in the absence of conditions of wind that would account for the failure to hear, it must be concluded that such failure arose from a lack of that strict attention which the foggy weather demanded.

The next inquiry is whether the negligent inattention was the proximate cause of the accident on the part of either or both vessels. The vessels were approaching very nearly head on, but were probably so placed as to see each other slightly on the port bow. Had the Palmer heard the Gadsby's fog whistles, what should she have done? The schooner's primary duty was to keep her course whether or not she heard the signals. If she heard, should she have gone to either side or luffed? If she had made any of these maneuvers, and the steamer had collided with her, her particular maneuver would have been urged as a fault against her. But what is more important is that, with the steamer practically dead ahead of the schooner, the latter could not know what course to pursue, other than to hold her course, as she could not know the steamer's location and probable maneuver. Had the steamer been broad on either side of her, or so far to either side as to establish the relative location of the vessels, it could be urged with better reason that the schooner should have heard, and have taken action accordingly. But, as the vessels were related to each other, the schooner ought to have heard, but ought not to have taken action, at least until she had a course signal from the steamer, or saw her coming upon her. The law commands the action of sailing vessels, and establishes a rule that to the largest degree insures that certainty which is essential to safe navigation. The sailing vessel departs from the injunction to keep her course, at high peril both on the sea and in the court, and in the case at bar she did just what she should have done had she duly heard the opposing whistles. With the Gadsby the result is different. Had she been duly attentive and heard the schooner's fog horn, she could have pursued two courses, or one of two courses. She could have stopped the steamer and availed herself of an opportunity to hear and locate the schooner's fog signals, and thereupon maneuver respecting them, and given and obeyed earlier course signals. If the schooner came in sight with the steamer at rest, the injury would have been such as would arise from the momentum of one rather than two moving vessels, and the space that separated the vessels, upon their sighting each other, would be traversed by one vessel alone, thereby allowing greater time for the vessels to avoid each

other. But, above all, it was the duty of the steamer to hear and keep out of the way, if she could do it by exercising due care; she had no right to keep her course; and, if there was a probable advantage in her being in motion rather than at rest, she could, after having located the sailing vessel by stopping or otherwise, have chosen her course, and possibly, perhaps probably, avoided the sailing vessel, according to her duty.

From these considerations it is concluded that the inattention of the schooner was not, and of the steamer was, the proximate cause of the collision. Therefore the libelant Clark should have a decree for his damages, and the libel filed by Robinson should be dismissed.